**UNITED STATES of America**

v.

**Harry GREEN, Appellant.**

**No. 71-1754.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 18, 1972.

Decided June 28, 1972.

Rehearing Denied Aug. 4, 1972.

Mr. Stanley O. Sher, Washington, D. C., with whom Mr. Alan S. Davis, Washington, D. C. (both appointed by the Court), was on the brief, for appellant.

5. I *Kings* 3:16–28.

Mr. Robert Alan Jones, Asst. U. S. Atty., with whom Messrs. Harold H. Titus, Jr., U. S. Atty., John A. Terry and Roger E. Zuckerman, Asst. U. S. Attys., were on the brief, for appellee.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

TAMM, Circuit Judge:

This appeal follows from a conviction for carrying a pistol without a license in violation of D.C.Code § 22–3204. Appellant asserts that his Fourth Amendment rights were violated in that the search of his automobile incident to a traffic arrest was unwarranted and unnecessarily broad in scope. Resolving these matters adversely to appellant, we affirm the decision of the district court.

## I.

At approximately 2:00 a. m. one October evening, police officers Wells and Bolden, on routine patrol in a marked squad car, observed appellant's vehicle travelling at an excessive speed[1] on 13th and W Streets, N.W. They proceeded to follow the vehicle at a distance of approximately one car length whereupon appellant "ran a stop sign." The officers immediately turned on their flashing red dome light "in preparation of making a routine traffic stop." Prior to bringing appellant's vehicle to a halt, Officer Wells testified that when he saw appellant "his body was leaned over, and it appeared as though his arm was in front of his body, not to the side or to the rear." The officer stated that he believed appellant had moved his left arm and that appellant's shoulder, elbow and forearm were visible to him. He further testified that it did not appear that appellant "was going for his wallet." Both officers testified that their immediate reaction was that appellant was armed. Officer Wells testified that he stopped the police vehicle one and one-half car lengths in back of appellant's car instead

of almost immediately to the rear as is usual. He also took the added precaution of ordering appellant out and away from his car via the cruiser's public address system. The defendant did as told, leaving the car door open according to the officers, although appellant asserts it was closed. Appellant alighted from his automobile proceeding to the rear where Officer Bolden conducted a "frisk," finding nothing. Meanwhile, Officer Wells was standing beside the cruiser with one hand on a radio and the other placed upon the butt of his undrawn revolver. Appellant produced his license, but did not have the registration card, whereupon he told Officer Bolden it may be in the glove compartment.[2] Officer Bolden then proceeded to lean inside the car from the driver's side and recover a fully-loaded pistol from underneath the driver's seat.

At a hearing on appellant's motion to suppress the government originally relied upon the "plain view" theory to justify the search. The trial court, however, stated that it disbelieved the officers' testimony and accordingly granted the motion to suppress. Shortly thereafter the government filed a motion for reconsideration. In its motion the government abandoned its theory that there was a "plain view" search and urged that the search was a protective one. The trial court thereupon reversed itself, denying the motion to suppress, and holding the search valid.

## II.

The Fourth Amendment proscription against unreasonable searches and seizures bans warrantless searches with certain exceptions. The exception relevant to our instant inquiry, search incident to arrest, is justified when used to remove any weapons the arrestee might seek to use in order to resist arrest or effect his escape; or when used to seize the fruits, implements or evi-

---

1. Although the testimony is in conflict as to whether appellant was speeding, the trial judge made a factual finding to that effect. Tr. II 30.

2. Appellant testified he did not have the registration on his person whereas Officer Bolden testified that he did.

dence of the crime for which the arrestee is seized in order to prevent its destruction. Chimel v. California, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Sanction of searches incident to arrest, however, "does not mean that [the person arrested] is subject to any and all searches that the arresting officer may wish to conduct." United States v. Mills, No. 22,444 sl. op. 5 (D.C.Cir. May 10, 1972) (en banc). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The touchstone both as to whether the search is warranted and the propriety of its scope remains reasonableness. Although it is clear that an automobile is entitled to less privacy than a home under the Fourth Amendment, Chambers v. Maroney, 399 U.S. 42, 48–51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the law with regard to a search incident to an arrest for a traffic violation remains unsettled.[3] The Supreme

Court left the question open in Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 221, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968), and not unexpectedly the federal and state courts have set forth divergent views.

■ In a clear, scholarly analysis in another case, Judge Wright has delineated two categories of traffic arrests— "pure" and "special circumstances." [4] The "pure" traffic situation is one in which mere routine procedures are undertaken by the officer to ticket the offender.[5] In this category several courts have stated that there is no right to search, relying upon the theory that since there are no fruits, instrumentalities or evidence to be gathered from a traffic arrest there can be no search incident thereto. E. g., Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968) (dictum); People v. Superior Court of Yolo County, 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970) (en banc). See cases collected in Annotation, Lawfulness of Search of Motor Vehicle Following Arrest for Traffic Violation, 10 A.L.R.3d 314 (1966) and B. George, Constitutional Limitations on Evidence in Criminal Cases 70 (1969). Other courts have, however, implied or stated in broad terms, often without exposition or explanation, that there is a right to search incident to a traffic arrest. E. g., Sumrall v. United States,

---

3. For contrasting views on whether a stop for a traffic violation is an "arrest" for legal purposes, compare United States v. Washington, 249 F.Supp. 40 (D.D.C. 1965) and McGee v. United States, 270 A.2d 348 (D.C.App.1970) with Bailey v. United States, 128 U.S.App.D.C. 354, 363–366, 389 F.2d 305, 314–317 (1967) (Leventhal, J. concurring). See also, Agata, Searches and Seizures Incident to Traffic Violations—A Reply to Professor Simeone, 7 St. Louis U.L.J. 506, 516 (1962); Note, Search and Seizure— Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347, 352.

4. Judge Wright's appellation is contained in his dissenting opinion in United States v. Robinson, 145 U.S.App.D.C. 46, 447 F.2d 1215 (1971) (en banc), which is now again pending before us following a remand. In Robinson the government ar-

gues that there is an unlimited right on the part of the officer to conduct a full search incident to any arrest since a lawful arrest, unlike an investigatory stop, creates a continuing relationship between the officer and his prisoner. Our case, on the other hand, involves a relatively minor traffic infraction for which an officer would most likely not take the driver into custody, although he certainly could. D.C.Code § 23–1110(b) (1) (Supp. V 1972).

5. Of course when an arrest on a traffic charge is used as a pretext to justify a search for evidence of other crimes the search is invalid. Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449 (1968); Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968); Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961).

382 F.2d 651 (10th Cir. 1967); Welch v. United States, 361 F.2d 214 (10th Cir. 1966); Watts v. State, 196 So.2d 79 (Miss.1967); Lane v. State, 424 S.W.2d 925 (Tex.Cr.App.1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2270, 20 L.Ed.2d 1387 (1968); State v. Coles, 20 Ohio Misc. 12, 249 N.E.2d 553 (1969); *See* cases collected in Simeone, Search and Seizure Incident to Traffic Violations, 6 St. Louis U.L.J. 506, 512 n. 35 (1961); Note, Search and Seizure—Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347, 357 n. 56. Since the ramifications of a search incident to a "pure" traffic arrest are presently under consideration by this court in United States v. Robinson, we need not mediate this dispute here.

The second category of traffic arrest is that involving "special circumstances." In such situations there are special circumstances which alert the officer or create in him a reasonable apprehension of danger. Courts have consistently held that in such circumstances a search is permissible.[6] Among the many special circumstances recited by Judge Wright in *Robinson* is the situation in which an "officer notes a suspicious movement by one of the car's occupants as he makes his approach."[7]

■ In the case at bar we note that although the traffic arrest may have begun as a "pure" or routine one, it ceased to be such when the officers, observing the furtive movements by the occupant of the vehicle, became reasonably fearful of danger. The testimony of the officers and the precautionary action taken by them clearly indicates their apprehension of harm. According to the testimony the officers stopped their scout car further back than normal. In addition, contrary to usual procedure, appellant was ordered out and away from the car via a public address system. Moreover, one officer put a hand on his revolver while holding the radio in the other hand.

■■ While these facts demonstrate fear on the part of the officers, this is not sufficient for our purposes. The fear must be a reasonable one. As the Supreme Court has stated, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate?" Terry v. Ohio, *supra*, 392 U.S. at 21–22, 88 S.Ct. at 1880. Of course the conduct must be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training, Jackson v. United States, 112 U.S.App.D.C. 260, 302 F.2d 194 (1962), for "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer."[8] Davis v. United States, 133 U.S.App.D.C. 172, 174, 409 F.2d 458, 460 (1969).

Having considered the totality of facts and circumstances, United States v. Davis, 147 U.S.App.D.C. 400, 458 F.2d 819 (1972), we are of the view that the officers' fear was reasonable. Confronted with a speeding vehicle running a stop sign at 2:00 a. m., they observed the driver making furtive movements as though pulling something out of his belt and placing it under his seat. We believe this is a sufficient basis upon which to uphold the limited protective search conducted here. An officer "need not defer protective measures to the

---

6. Such a position also finds support in the American Law Institute's Model Code of Pre-Arraignment Procedure (Proposed Official Draft No. 1 1972). See § 230.2, §§ 110.2(1) and (2) (search for weapons); § 230.4 (search of vehicles); § 290.2(2) (standard for suppression).

7. United States v. Robinson, *supra* note 4, 145 U.S.App.D.C. at 62, 447 F.2d at 1231 n. 14.

8. At the time of the arrest Officer Wells had one and one-half years experience with the Metropolitan Police and four years prior experience as a military policeman. Officer Bolden had two years experience in the Detroit Police Department.

point of peril. All the law requires is that he have reasonable basis for believing that his safety or the safety of others requires a search or seizure." Young v. United States, 140 U.S.App.D.C. 333, 337, 435 F.2d 405, 409 (1970).

The cases principally relied upon by appellant do not dissuade us from our holding. In many of the cited cases there is no indication that the officers were fearful of their own safety. *E. g.,* United States v. Collins, 142 U.S.App. D.C. 100, 439 F.2d 610 (1971); United States v. Humphrey, 409 F.2d 1055 (10th Cir. 1969); Grundstrom v. Beto, 273 F.Supp. 912 (N.D.Tex.1967). More particularly, in People v. Superior Court of Yolo County, *supra,* a case upon which appellant places great emphasis, the court was dealing with an entirely different situation from that which now faces us. The traffic stop there, occurring on a well-travelled highway at 8:00 a. m., involved an officer turning his back on the defendant thereby clearly indicating his lack of fear. Beyond the holding in that case there is, of course, much dicta. We are not persuaded by this dicta nor that contained in Amador-Gonzalez v. United States, *supra.* Furthermore, we note that in our own jurisdiction a search similar to the instant one has been held valid. McGee v. United States, 270 A.2d 348 (D.C. App.1970).[9]

### III.

▮ Appellant also asserts that the scope of the search was unnecessarily broad. After reviewing the record we must, however, disagree. Under familiar rubric it is clear that the "search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Terry v. Ohio, *supra,* 392 U.S. at 19, 88 S.Ct. at 1878. Incident to an arrest an officer may make a warrantless "search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Chimel v. California, *supra,* 395 U.S. at 763, 89 S.Ct. at 2040. *See* Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). As a result of the potential danger to the community and the officer which weapons pose, United States v. Blyther, 132 U.S.App. D.C. 344, 345, 407 F.2d 1279, 1280 (1969),[10] the situations in which a protective search will be permitted should be broader than those where the search is for non-protective reasons, whereas the scope of a protective search in a non-continuing relationship context should be more restrained.[11] We should, however, keep in mind the peculiar nature of the animal with which we are dealing for "[n]o discussion of crime can ignore the automobile, or the fact that the incidence of crime is hinged directly to the amount of privacy we accord it." State v. Boykins, 50 N.J. 73, 77, 232 A.2d 141, 145 (1967).

We hold the search conducted in the instant case was sufficiently limited in

9. In *McGee* the officer, observing appellant speeding, turned on his light and siren. When appellant refused to stop the car the officer used the public address system. Still refusing to stop, the officer observed appellant reach down below the front seat and apparently hide something. The officer finally placed his car in front of appellant's vehicle and stopped him. The court found the search reasonable stating that "[t]he significance of appellant's movement is that it was made simultaneously with the realization that he was about to be halted." 270 A.2d at 350. *McGee* was subsequently cited for the proposition that a search incident to an arrest which involves a person attempting to hide something is a reasonable search. Mayfield v. United States, 276 A.2d 123 (D.C.App.1971).

10. 91.82% of the 110 reported police officer deaths occurring in the period July 1970 to June 1971 were attributable to firearms. International Association of Chiefs of Police, Annual Law Enforcement Casualty Summary 2 (July 1970– June 1971).

11. *See* Note, Searches of the Person Incident to Lawful Arrests, 69 Colum.L.Rev. 867, 870–871 (1969).

scope to satisfy constitutional requirements. The officer first conducted a limited "frisk" for weapons upon the person of appellant. He then went to the car and recovered a fully-loaded pistol from under the driver's seat where he reasonably expected it to be. The officer did not search the trunk, glove compartment or back seat. His search was not general or exploratory, but rather limited to the danger at hand. The search under the driver's seat of an open-door vehicle to which the driver will return is a search of an area under the immediate control of the driver. *Cf.* United States v. Free, 141 U.S.App.D.C. 198, 201, 437 F.2d 631, 634 (1970); Young v. United States, *supra;* Application of Kiser, 419 F.2d 1134 (8th Cir. 1969). Our result is in accordance with the view of an often cited commentator who states: "[i]f after initiating the encounter the experienced officer reasonably believes that the driver or occupants may be armed, he should be fully justified in ordering them out, frisking them, and *quickly checking the part of the vehicle that might be accessible to them* if they should break away from the officer and attempt to flee." [12]

Although appellant asserts that it is "incredulous" that he would open fire on the officers after they had permitted him to re-enter his vehicle, we note that the possibility is not as remote as one might think. An examination of the statistics for the year of July 1970 to June 1971 shows that 92 officers were injured and 6 slain in the course of making traffic arrests.[13] As one court has observed "the cemeteries and police stations contain living epitaphs of those dedicated traffic officers who failed to

take reasonable precautions for their own protection." [14] Moreover, the arrestee may not be the respectable citizen we would like him to be, but rather he may be an individual who may have good reason to avoid a prolonged encounter with the police thereby resulting in resort to a weapon or attempted escape. Furthermore, it has not been demonstrated to date that searches incident to traffic violations have been subjected to abuse. Finding no error, the judgment of the district court is

Affirmed.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

This is a disarmingly simple case, but the court's disposition of it, in my judgment, jeopardizes the privacy and the constitutional rights of every citizen who drives a car in the nation's capital. As the majority's statement of the facts indicates, two police officers in a patrol car saw appellant, driving alone, run a stop sign. Instead of giving him a ticket for this offense, the officers ordered him out of his car, frisked him, and then examined his driver's license. The search of appellant's person was unproductive, and his driver's license was in order.[1] Nevertheless, the police proceeded to search under the front seat of the car where they found a gun.

It is not suggested that the officers had probable cause prior to their search of the car to arrest and search appellant for the offense of carrying a concealed weapon. Nor is it suggested that any general right to search derives automatically from an arrest for a mere traffic violation.[2] Rather, the majority strains

12. B. George, Constitutional Limitations on Evidence in Criminal Cases 73 (1969) (emphasis supplied) (citation omitted).

13. International Association of Chiefs of Police, *supra,* note 10, at 49.

14. State v. Coles, 20 Ohio Misc. 12, 18, 249 N.E.2d 553, 559 (1969).

1. There was some confusion as to whether appellant produced his registration statement along with the driver's license.

Officer Bolden testified that appellant had the registration statement on his person, whereas appellant testified that it was in the glove compartment of the car.

2. As the majority recognizes, the question whether and under what circumstances the police may search an individual incident to a "pure" traffic arrest is presently under consideration by this court *en banc* in United States v. Robinson, No. 23,734.

to uphold these intrusions upon appellant's privacy as protective measures justified by the exigencies of this particular encounter. As the majority recognizes, a police officer unquestionably has the right and indeed the duty to take reasonable precautions to protect himself against potential danger. But as important as this interest may be, it is not absolute, for the officer's interest in self-protection must always be balanced against the often competing right of all persons to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment. Thus, although a police officer may frisk for weapons when he has reason to believe that he is dealing with an armed and dangerous individual, such intrusions are permissible *only* if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the officer's belief that he is in danger. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

In the instant case the "need" for protective measures was predicated solely [3] on the officers' observation of certain "furtive" movements as appellant pulled his car to the curb in response to their

signal. Specifically, Officer Wells testified that he saw appellant lean "forward and to one side, and one of his elbows went into the air as though he may have been pulling something out of his belt." (Tr. 8) He was uncertain as to which of appellant's arms moved, he could not see appellant's hand, and he viewed only part of appellant's forearm. (Tr. 17–18.) Officer Bolden testified that he saw appellant lean forward and then down, "as if he was putting something under the seat." (Tr. 32.) He could not say which arm had moved, and did not perceive any movement of appellant's hand, elbow or forearm. (Tr. 37–38.) On the basis of these rather ambiguous observations, the officers concluded that appellant was armed and dangerous, and the majority upholds this fear as reasonable. Thus, in practical effect, the majority holds today that whenever a police officer, in the course of making a traffic arrest, sees an occupant of the vehicle "lean forward" or "bend down" or "move his arm," he may reasonably conclude that the occupant is armed and dangerous and may therefore subject the occupants of the vehicle to the embarrassment and indignity of a protective search for weapons. With due respect to my brethren, I am forced to dissent.

3. The majority states that its finding that the officers' fear was reasonable is predicated upon an examination of the "totality" of the facts and circumstances of the encounter. Specifically, the majority identifies 3 such circumstances—the "furtive" movements, the fact that appellant was "speeding," and the fact that the confrontation occurred at night. In my view the latter 2 "circumstances" are mere makeweight and add nothing to the officers' belief that appellant was armed and dangerous. As to appellant's "speeding," Officer Bolden flatly testified that appellant did not exceed the legal speed limit of 25 miles per hour. (Tr. 16.) Moreover, even if appellant had in fact been speeding, this would simply give rise to another traffic offense; it would not in any way suggest that appellant was armed and dangerous. As to the fact that the confrontation occurred at night, it seems clear that otherwise innocent conduct cannot be transformed into culpable

behavior simply by virtue of the lateness of the hour. It is no crime for a citizen to be out after dark. Indeed, " '[i]f I choose to take an evening walk to see if Andromeda has come up on schedule, I think I am entitled to look for the distant light of Almach and Mirach without finding myself staring into the blinding beam of a police flashlight.' " Papachristou v. City of Jacksonville, 405 U.S. 156, 164 n. 6, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972), quoting Reich, Police Questioning of Law Abiding Citizens, 75 Yale L.J. 1161, 1172 (1966). Further, Officer Bolden testified that appellant was stopped in a "well lit" area (Tr. 32), and it was not claimed that extra caution was required because of the late hour. Thus the majority's opinion must be viewed, as a practical matter, as sustaining this search solely on the basis of the so-called "furtive" gestures observed by the officers.

In People v. Superior Court of Yolo County [*Kiefer*], 3 Cal.3d 807, 91 Cal. Rptr. 729, 478 P.2d 449 (1970) (*en banc*), the Supreme Court of California issued a thoughtful, exhaustive and convincing opinion on the law of vehicle searches premised upon so-called "furtive" movements.[4] Initially the court noted that "[t]he potential for misunderstanding in such [situations] is obvious." 3 Cal.3d at 818, 91 Cal.Rptr. at 735, 478 P.2d at 455. The causes of such "misunderstanding" may be divided into two separate categories. First, there is a real danger that the officer may not perceive the gestures accurately. As in the instant case, the officer typically observes the gestures not only from outside the suspect's car, but also from one car to another while both are still in motion. Moreover, again as in the instant case, the confrontation frequently occurs at night, and although this factor might justify enhanced caution on the part of the police, it serves also to distort perceptual reliability and to magnify the "potential for misunderstanding."

But even if the officer overcomes these obstacles and perceives the movements accurately, there is the added difficulty that "from the viewpoint of the *observer*, an innocent gesture can often be mistaken for a guilty movement." 3 Cal.3d at 818, 91 Cal.Rptr. at 735, 478 P.2d at 455. (Emphasis in original.) Reliance upon "furtive" movements, in and of themselves, to justify intrusions upon Fourth Amendment rights necessarily assumes that the gestures in question were purposeful responses to the officer's presence and therefore indicative of "guilt." In some cases, however, the movements simply may not be responsive—that is, the suspect may not even be aware of the officer's presence or, even if cognizant of the situation, he might have been on the point of making the movements in any case. Similarly, the gestures might not have been purposeful, for "when suddenly facing an imminent confrontation with the police for some unknown misdeed, many citizens with nothing to hide will nevertheless manifest an understandable nervousness by means of random, undirected gestures or movements." 3 Cal.3d at 822, 91 Cal.Rptr. at 738, 478 P.2d at 458.

More importantly, even if the movements are both responsive and purposeful, reflection will suggest many more innocent than guilty explanations for a motorist's act of "leaning forward" or "bending down" or "moving his arm":

"To begin with, every motorist knows that the approaching police officer will in all likelihood ask to see his driver's license, and probably also the registration card of the car. The observed movement, therefore, might well be nothing more than the driver's act of reaching for his wallet so as to have his license ready for inspection, or reaching for the steering post or glove compartment to obtain the registration card. * * *

"Furthermore, every motorist knows that the officer will wish to speak with him, however briefly; simple preparations for that conversation are therefore to be expected. It may be

---

4. In *Kiefer* a police officer observed an automobile exceeding the speed limit. He gave chase and signalled the car to pull over, which the driver immediately began to do. The officer then saw a woman's head rise from the passenger front seat— she turned, put her arm over the back seat, turned again toward the front, bent down toward the floor, and then resumed her normal sitting position. Upon stopping the automobile, the driver walked to the officer, produce his license, and acknowledged his violation. The officer then approached the passenger side where the female occupant remained seated. He opened the door and saw what appeared to be marijuana in the crack of the seat cushion. The officer then conducted a thorough search of the car and, upon finding additional quantities of marijuana, arrested the driver and passenger for unlawful possession and transportation of marijuana. The Supreme Court of California held that the "furtive" movement by the female passenger justified neither a protective search for weapons nor a general search for contraband.

necessary, for example, for the driver to roll down his window. If the radio is playing at the time, the driver or a passenger might lean forward to reduce the volume or turn off the set. If the driver was smoking, he might well reach down to extinguish or store his cigarette in the car's ashtray. And if an occupant of the vehicle was consuming food or beverages, similar movements would probably follow.

"Additionally, many motorists expect to alight from their car, whether voluntarily or upon request, when they are stopped by the police. Again, certain preparations are usually in order: seat belts may have to be unbuckled; passengers may have to remove road maps, packages, [or] folded coats * * * from their laps; and clothing may have to be adjusted, shoes or hats put on, belts tightened, and outer garments buttoned.

"Finally, when a driver stops his car in a situation in which he knows he may alight from the vehicle, it is both customary and prudent for him to apply his parking brake. * * * Yet in many automobiles the parking brake handle or lever is on or below the dashboard, and the driver is therefore compelled to lean forward or downward in order to apply it.

"Each of the foregoing gestures in some degree resembles—and could reasonably be mistaken for—the movements of a person engaged in secreting [a weapon] inside a car. Yet each is wholly innocent, and has been made at one time or another by virtually every driver or passenger on the roads today. * * *"

3 Cal.3d at 822–823, 91 Cal.Rptr. at 738– 739, 478 P.2d at 458–459. (Footnotes omitted.)

For these reasons, then, it has long been settled that a police officer's ob- servations of mere " 'furtive' movements alone establish nothing." United States v. Humphrey, 10 Cir., 409 F.2d 1055, 1059 (1969); See Kiefer, supra, 3 Cal. 3d at 818, 823, 829, 91 Cal.Rptr. at 735, 739, 744, 478 P.2d at 455, 459, 464; cf. Sibron v. New York, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Rather, to provide reasonable suspicion sufficient to authorize even a limited protective search for weapons, the "furtive" gestures must be coupled with some other evidence that the suspect is dangerous. Indeed, the wisdom of such a rule is demonstrated in the instant case, for although a gun was in fact found, there was simply no basis at the time of the search upon which the officers might reasonably have believed that appellant was attempting to secrete a weapon rather than seeking merely to extract a wallet from his pants pocket.[5] To be sure, with the advantage of hindsight such speculation may appear quite reasonable, but unfortunately hindsight is never available in advance, and the Supreme Court has wisely warned us time and again of the danger of justifying illegal searches on the basis of evidence disclosed therein. See, e. g., Sibron v. New York, supra, 392 U.S. at 63, 88 S.Ct. 1889; Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Johnson v. United States, 333 U.S. 10, 16–17, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

Thus, as important as a police officer's interest in self-protection may be, that interest cannot be transformed into a hunting license abrogating Fourth Amendment rights on the basis of unexceptional and commonplace conduct. Appellant's gestures were nothing more, and if these officers were justified in believing they were in danger on the facts of this case, then the requirement of reasonable suspicion has indeed become meaningless. The approach adopted by the majority today subjects all

---

5. Indeed, appellant testified that he had placed the gun under the seat long before his encounter with the police and that the movements actually observed by Officers Wells and Bolden occurred when he reached for his wallet to obtain his driver's license for inspection, an explanation which Officer Bolden admitted was possible. (Tr. 19.)

citizens, whether violating the law or not, to searches without probable cause or, in my view, even reasonable suspicion. Such a result is supported by neither logic nor precedent.[6]

Indeed, with regard to this matter of precedent, I must note that, with a touch of irony, the majority cites one of my own dissents in a traffic case as supportive of its holding today. While I am flattered by the citation, particularly of a dissent, I am startled by its use to justify this search. That dissent is really a legal polemic against precisely the kind of unreasonable invasions of citizens' rights as occurred in this case.[7] I recommend that it be widely read in the hope that law abiding citizens will not be subjected to the indignity of police searches simply because they have "bent over" in order to obtain their driver's license, put on a shoe, or unbuckle a seat belt.[8]

I respectfully dissent.

---

6. The only case cited by the majority as specifically supporting its decision today is McGee v. United States, D.C.App., 270 A.2d 348 (1970). In *McGee*, however, the search was justified not only by the officer's observations of "furtive" movements, but also by substantial additional evidence of guilt. Thus, unlike the instant case, the defendant in *McGee* refused to stop his vehicle in response to the officer's signal, and the officer was compelled to cut in front of the defendant's car in order to force him to the curb. This fact, when *coupled* with evidence of "furtive" movements, provided probable cause to believe the defendant was attempting to escape the officer in order to hide his possession of contraband or instrumentalities of crime. *McGee*, therefore, simply does not support the majority's holding today that "furtive" movements, *in and of themselves*, can justify a protective search for weapons.

7. In my dissent in United States v. Robinson, 145 U.S.App.D.C. 46, 447 F.2d 1215 (1971) (*en banc*), referred to by the majority, I suggested that a search of the person or automobile incident to a traffic arrest may be proper if justified by certain "special circumstances." 145 U.S. App.D.C. at 61–62, 447 F.2d at 1230–1231. One such circumstance might arise "when the officer notes a suspicious movement by one of the car's occupants as he makes his approach." 145 U.S.App. D.C. at 62 n. 14, 447 F.2d at 1231 n.

14. As authority for this proposition, I cited United States v. Thomas, S.D.N.Y., 289 F.Supp. 364 (1968), and even a cursory examination of *Thomas* makes clear the limited nature of my suggestion. In *Thomas* the police officer stood at the driver's window and actually saw the defendant take a small packet from inside his coat pocket, crouch down, and put it under the rear of the front seat. Thus, unlike the instant case, where the officers could only speculate as to what appellant's innocent movements might signify, there was no need in *Thomas* for the officer to guess as to the nature of the movement. The driver was obviously attempting to hide the packet in full view of the officer, and neither *Thomas* nor my dissent in *Robinson* can properly be viewed as supporting the majority's holding today.

8. The majority also holds today that when the police reasonably suspect the driver of a vehicle to be armed they are justified, at least under the facts of this case, not only in frisking the driver for weapons, but *also* in conducting a further, albeit limited, search of the vehicle. Since I would dispose of this case on the ground that the officers did not have sufficient reasonable suspicion even to frisk appellant, there is no need for me to reach the question whether a search of the vehicle would have been proper if such reasonable suspicion had in fact existed.