400 So.2d 974 (1981)
Donald Lee HOCHSTETLER, Appellant,
v.
STATE of Florida, Appellee.
No. 79-1381.
District Court of Appeal of Florida, Fourth District.
March 4, 1981.
Rehearing Denied July 22, 1981.
Richard L. Jorandby, Public Defender, and James K. Green of Brown & Green, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Robert L. Bogen, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Defendant appeals his conviction of possession of marijuana upon entry of a nolo contendere plea expressly reserving the right to appeal the denial of his motion to suppress. It is asserted that the warrantless search of defendant's vehicle was not authorized under the Florida stop and frisk law. Section 901.151, Florida Statutes (1979). The initial investigatory stop and frisk by the police of the defendant is not contested in this appeal. At the hearing on motion to suppress the defense agreed that defendant had been legally detained and that there was no objection whatsoever to the initial detention. After this stop and frisk occurred, the police made a reasonable self-protective search in the front seat area of defendant's vehicle because the defendant made a sudden move toward this area. This search was of a limited nature and in response to the defendant's actions. A bag which police felt might contain a weapon was found on the floor of the front seat. Upon picking up the bag the odor of marijuana was noticed and the bag seized.
We conclude that the denial of the motion to suppress was in accordance with Brown v. State, 358 So.2d 596 (Fla. 2d DCA 1978) and Stevens v. State, 354 So.2d 110 (Fla. 3d DCA 1978). The Brown decision authorizes limited protective searches as was the situation here. In Stevens the defendant was stopped while getting into his car in an apparent intoxicated condition. He made a move toward an object on the front seat which was wrapped in a towel. The police got to the object first and discovered an unsuspected gun. The court upheld the search as reasonably justified to protect the safety of the officer. We hold that the facts here, when construed in a light favorable to supporting the trial court's order, clearly gave the police sufficient grounds to act as they did. We, therefore, affirm the order denying the motion to suppress.
AFFIRMED.
*975 MOORE and BERANEK, JJ., concur.
ANSTEAD, J., dissents with opinion.
ANSTEAD, Judge, dissenting:
Because I believe the majority decision extends the purpose and scope of a "stop and frisk" search from a carefully proscribed protective pat-down of a suspect's clothing to an unauthorized warrantless search of his automobile, I dissent.
Shortly before 1:00 a.m. on December 7, 1978, the City of Fort Lauderdale Police Department received an anonymous telephone tip that a white male had been seen attempting to break into a vehicle in a parking lot across the street from a condominium. Officer Hart was dispatched to investigate.
When Hart arrived at the parking lot he observed Donald Hochstetler standing by the right front of his vehicle. As Hart approached, Hochstetler "kind of half jogged" around the back of the car to the driver's door, reached for the door handle and started to enter the car. Hart ordered appellant to freeze, which he did. A pat-down for weapons, the propriety of which is not contested here, proved negative. Two other police vehicles entered the parking lot at the same time and the other officers proceeded to search the lot for signs of any break-ins. A check of the other cars in the parking lot revealed that no breaking and entering had occurred.
Hochstetler explained to Hart that he had just changed a flat tire on his car. However, his trunk was closed, all four tires on the car were fully inflated, and no tools were immediately observable. Hochstetler also produced his driver's license as requested. While a computer check of the license was in progress, Hochstetler made what Hart called a "sudden move" towards his car, saying he was going to get his keys to open the trunk for the officers to prove he had just changed a flat tire. Hart blocked Hochstetler before he reached the door and ordered him not to enter the vehicle. Hochstetler complied with this order and made no further effort to enter the vehicle.
However, at this point, Hart later testified, "I felt something was wrong, and I felt that one of the possibilities (was) that it would be a weapon." Hart explained that generally, in "cases like this, I always have a fear there's a weapon until I find out different or I find out there wasn't a crime." He therefore decided to search the front seat of the vehicle for weapons.
In the course of his search, Hart discovered a brown paper bag underneath the brake pedal. The bag was opened and marijuana was found inside. After finding the bag, Hart searched the car's glove compartment, the area under the front seats, and the trunk. Consent was given only for the search of the trunk, where Hart discovered a warm flat tire. An examination of the ground area near the right front of the car also provided corroboration of Hochstetler's contention that he had been changing a tire.
In Florida the legislature has enacted a "stop and frisk" statute that sets out the guidelines under which a temporary investigatory stop and search incident thereto may be conducted. Section 901.151(5), Florida Statutes (1979) provides:
Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) has probable cause to believe that any person whom he has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, he may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized. (Emphasis supplied).
Under the provisions of this statute there is no automatic right to search just because a stop has been made. Schnick v. State, 362 So.2d 423 (Fla. 4th DCA 1978). Rather, there must be circumstances indicating the presence of a weapon. Schnick, supra.
*976 Time was when police "stops and frisks" of individuals whose suspicious conduct fell short of establishing probable cause for arrest occupied a "gray area" of the law. They existed and were clearly necessary in some cases, but their propriety was unsanctioned since they were believed to constitute a violation of the rule requiring probable cause before an arrest and a search incident thereto could be conducted. The landmark case of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), reflected a belated judicial recognition of the practice, and sought to prescribe standards by which the now-legitimated "stop and frisk" of possible criminal suspects would be governed. In Terry, the Supreme Court held that the propriety of a "stop and frisk" in a given situation depended on the balancing of two competing interests: the governmental interest of safe and effective law enforcement, and the individual interest of freedom from unreasonable searches and seizures as guaranteed by the Fourth Amendment:
Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Cf. Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 174-176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035 (1878). And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. Cf. Brinegar v. United States, supra.
(Terry v. Ohio, supra, at 392 U.S. 27, 88 S.Ct. 1883, 20 L.Ed.2d 909.)
The factual situation in Terry involved a stop and frisk which was clearly reasonable by objective standards, which was undertaken for the sole purpose of preventing possibly imminent violence, and was properly limited in scope. The officer in Terry observed three men casing a store for the evident purpose of robbery. The men made a combined total of twenty-four passes by the store window. After one of the suspects failed to answer a request for identification, the officer frisked all three suspects, discovering weapons on two. The trial court's denial of the defendants' motion to suppress was eventually upheld by the Supreme Court.
The Terry court was careful to confine its holding to the specific facts of that case:
Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
392 U.S. 30, 31, 88 S.Ct. 1884, 1885, 20 L.Ed.2d 911. The scope of a Terry search for weapons in the absence of probable cause for arrest "must, like any other search, be strictly circumscribed by the exigencies which justify its initiation," 392 U.S. 25, 26, 88 S.Ct. 1882, 20 L.Ed.2d 908.
*977 Two cases which help define the limits of a Terry search under circumstances somewhat similar to those involved herein are Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) and Brown v. State, 358 So.2d 596 (Fla. 2d DCA 1978).
In Adams v. Williams, an officer on duty at 2:15 a.m. received information from a reliable informant that the defendant, sitting in a nearby vehicle, was carrying narcotics and had a gun in his waistband. The officer approached defendant's car and ordered the defendant to get out. When the defendant failed to exit the vehicle and rolled the window down instead, the officer, fearing for his safety, reached into the car and grabbed a gun from the defendant's waistband. The gun was exactly where the reliable informant had said it would be. The officer's actions predicated on the reliable informant's tip and the defendant's conduct were found by the Supreme Court to be reasonable under the rationale of Terry.
The factual situation in Brown v. State was described as follows:
Appellant and a man named Thomas drove their borrowed Cadillac automobile into the parking lot of a convenience store at 8:00 at night. They sat in the car for approximately one hour. Thomas entered the store, made a small purchase, and returned to the vehicle. The men continued to sit in the car. Fearing that a robbery may occur, the cashier in the store had the sheriff's department notified. Deputies Harrison and Smith, and Police Chief Liller responded to the call. When Chief Liller's marked cruiser entered the parking lot, appellant quickly exited his vehicle and nervously ran to the cruiser. He informed Chief Liller that the Cadillac would not start. Appellant returned to the Cadillac with Chief Liller to attempt to start the vehicle. Meanwhile, Deputy Harrison interviewed the cashier. The Cadillac started, but stalled when appellant removed his foot from the accelerator. Harrison joined Chief Liller at the driver's door of the Cadillac. Thomas appeared to be extremely nervous. As appellant again exited the Cadillac, the officers noticed a pronounced bulge in the waistline of Thomas' jacket. Fearing that the bulge may have been caused by a pistol, the officers commanded Thomas to remain still. As Harrison approached the passenger side of the vehicle in which Thomas was sitting, Thomas quickly shoved his hand under the armrest which divided the front seats. Harrison had Thomas step out of the automobile. Harrison patted down the outside of Thomas' clothing and discovered that the bulge was not caused by a weapon. Harrison reached under the armrest and retrieved a plastic bag containing tinfoil packets of heroin. The two men were placed under arrest and the operator of the Cadillac, appellant, consented to a full search of the vehicle. Appellant instructed the officers in opening the broken trunk latch. This search of the car's trunk produced a large amount of heroin and other incriminating evidence. 358 So.2d 597, 598.
The officer's actions in Brown were found to be reasonable under the rationale of both Terry and Adams.
There are substantial and, in my view, dispositive factual distinctions between Adams and Brown, on the one hand, and the case at bar on the other. The most significant distinction between these cases and the one at hand is the presence in those cases of specific evidence of the presence of a dangerous weapon. In Adams the reliable informant specifically reported both the presence and exact location of a weapon. And in Brown the officer specifically observed a bulge in defendant's jacket. These observations, coupled with the actions of the defendants and the other evidence of criminal conduct, specifically prompted the actions of the officers in Adams and Brown to search for a weapon. In contrast there is no evidence, much less specific, that indicated the presence of a weapon in this case. Another significant factual distinction involves the source and the nature of the officers' initial information. In Adams, the officer acted on specific and "hot" information supplied to him by a reliable informant. The Adams court noted: "The informant *978 was known to (the officer) personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip." 407 U.S. 146, 92 S.Ct. 1923, 32 L.Ed.2d 617 (emphasis added). In Brown, while the police did not appear to have had prior personal knowledge of the reliability of the cashier, they at least knew who she was. In both Adams and Brown, the police were certain that the defendants were the particular individuals the informants had described. By contrast, in the current case, Officer Hart not only had no way of determining the veracity of the anonymous telephone caller, he could not even be sure that the caller had referred to Hochstetler.
A third contrast between Adams, Brown and the present case is that Hochstetler provided the officer with a reasonable explanation for his behavior. No evidence of a break-in was found and had Officer Hart checked out Hochstetler's explanation that he had been changing a flat tire, which could have been done at no danger to anyone, the whole episode would have ended then and there. Section 901.151(4), Florida Statutes (1979), specifically provides that a detainee is to be released if, after an inquiry into the circumstances which prompted the temporary detention, no probable cause for the arrest of the person appears.
A fourth serious factual distinction between Adams and Brown and the current case involves the degree of potential danger presented by the defendants to the officers. In Adams, the defendant was sitting inside his vehicle, had not been frisked, and had aroused the officer's suspicion by rolling down his window in lieu of complying with a request to exit his car. In Brown, defendant Thomas was sitting inside his vehicle when the officer observed a bulge in his jacket; this was coupled with a furtive move apparently intended to remove or conceal an object under an armrest. The potential danger to the officers in both Adams and Brown was thus immediate, and their actions were reasonably designed to dissipate this danger. In contrast to the situations presented in Adams and Brown, Hochstetler was outside of his vehicle, had already been frisked, and had obeyed all of Officer Hart's commands immediately. And all of this took place in the presence of two additional police vehicles and numerous police personnel. The objective of a Terry search, the prevention of possible imminent violence, had already been accomplished when Hart decided to search the automobile.
A fifth distinction between Adams, Brown, and the case at bar involves the scope of the searches undertaken. The initial search in Adams was carefully limited to the specific portion of the defendant's clothing where the informant had indicated a gun would be found. The initial search in Brown, too, was carefully limited to defendant's jacket and the armrest, again, the specific areas about which a reasonable suspicion existed. Here, in contrast, the officer not only conducted a body frisk, but acting solely on the basis of Hochstetler's expressed intention to retrieve his car keys, conducted a complete search of the inside front portion of the automobile.
The majority here was apparently influenced by dicta in Brown which appears to take the Terry rationale for "stops and frisks", a well-founded suspicion of an imminent danger to safety, a step further:
[I]t is important to note that protective searches incident to an investigative stop involve the danger that the suspect will return to a vehicle in which a weapon may be hidden, since the investigating officer may not have probable cause to arrest the suspect. 358 So.2d at 600.
In this case, it is clear that the extent of Officer Hart's suspicions was his "feeling" that the appellant might have a weapon hidden in the car. Read in isolation without considering the factual circumstances presented in the case, the above quoted language of Brown might seem to justify a search based on such a suspicion. It is of course a sad commentary that such a suspicion can no longer be dismissed as groundless. As one court noted poignantly in a slightly different context:

*979 Although appellant asserts that it is "incredulous" that he would open fire on the officers after they had permitted him to re-enter his vehicle, we note that the possibility is not as remote as one might think. An examination of the statistics for the year of July 1970 to June 1971 shows that 92 officers were injured and 6 slain in the course of making traffic arrests. As one court has observed "the cemeteries and police stations contain living epitaphs of those dedicated traffic officers who failed to take reasonable precautions for their own protection.
United States v. Green, 465 F.2d 620 (D.C. Cir.1972). Rare is the day that passes without fresh reports of senseless and seemingly unmotivated violence against either police officers or the private citizens whose lives our officers have the duty to protect.[1]
It was this very concern for the safety of police officers that prompted the United States Supreme Court to uphold the right of an officer to require a person stopped for a routine traffic arrest to exit his vehicle. Pennsylvania v. Mimms, 98 S.Ct. 330, 434 U.S. 106, 54 L.Ed.2d 331 (1977). The court held that no search was involved and that the minimum discomfort caused to the motorist was more than offset by the resulting security such a requirement produced for the officer. That requirement is a far cry from the unlimited search of a private vehicle authorized by the majority here. Both our federal and state constitutions expressly prohibit general searches of the kind authorized by the majority here.[2] And the recent passage in Florida of a separate constitutional guarantee of the right of privacy hardly suggests support for increasing the authority of the government to search private premises or property without good cause. In any case, if such an automatic right to search attendant to every temporary *980 detention is to be granted to police authorities it should be done by the people through constitutional amendment and not by judicial fiat.
Officer Hart's concern that Hochstetler, once permitted to return to his vehicle, might have seized a weapon and irrationally opened fire on the officers, is certainly understandable. Who among us, confronting a stranger at 1:00 a.m. under suspicious circumstances, would not share this apprehension? Yet, a search of appellant's vehicle based on such a concern simply cannot be justified by any reasonable interpretation of Terry, Adams, or, ultimately, Brown.[3] All of these cases are clear that "specific and articulable facts" leading to a "well-founded reason to believe an accessible weapon is hidden" are required to justify a search in the absence of probable cause for arrest. Brown v. State, supra, at 600.

ON REHEARING
PER CURIAM.
The petition for rehearing is denied.
MOORE and BERANEK, JJ., concur.
ANSTEAD, J., dissents with opinion.
ANSTEAD, Judge, dissenting:
In his petition for rehearing the appellant claims that our decision herein directly conflicts with this court's decision rendered two weeks later in the case of Clements v. State, 396 So.2d 217 (Fla. 4th DCA 1981) wherein this court held:
The State argues that the search was justified as a protective search for weapons, extending beyond the immediate control of the suspects to an area where the officers could be endangered if the occupants were permitted to re-enter the vehicle, citing Brown v. State, 358 So.2d 596 (Fla. 2d DCA 1978). However, the Brown decision was specifically limited in the following manner:
We hold that under proper circumstances a police officer making a valid investigative stop involving an automobile may conduct a carefully limited search of areas accessible to occupants of the vehicle and in which the officer has, based upon specific and articulable facts, well-founded reason to believe an accessible weapon is hidden. This protective search may take place even though the occupants have been temporarily removed from the vehicle. The protective search must be limited to circumstances in which the investigating officer has received some reliable information, or has observed some furtive gesture, indicating the presence of a weapon in a particular and accessible area of the vehicle. The protective search must be conducted in a manner reasonably calculated to uncover weapons only. This extension of the scope of a protective search applies only where, at the time of the search, it appears that the suspect should be allowed to return to his vehicle. Id. at 600-601.
In the instant case, because of the nature of the crime reported in the BOLO and the circumstances surrounding the initial stop, the police officers had reason to believe that the suspects may be armed and dangerous. Nevertheless, the search cannot be justified. There was no reliable information received or furtive gesture observed indicating the presence of a weapon in a particular and accessible area of the vehicle.
At 218, 219.
I agree with appellant that the above statement from Clements constitutes a correct *981 statement of the law and that our holding herein is in conflict with the holding in Clements.
NOTES
[1] Opinions vary as to the causes and methods of dealing with this problem. One view was stated by the late Justice Douglas in his Adams v. Williams dissent:

The police problem is an acute one not because of the Fourth Amendment, but because of the ease with which anyone can acquire a pistol. A powerful lobby dins into the ears of our citizenry that these gun purchases are constitutional rights protected by the Second Amendment, which reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."
There is under our decisions no reason why stiff state laws governing the purchase and possession of pistols may not be enacted. There is no reason why pistols may not be barred from anyone with a police record. There is no reason why a State may not require a purchaser of a pistol to pass a psychiatric test. There is no reason why all pistols should not be barred to everyone except the police.
The leading case is United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206, upholding a federal law making criminal the shipment in interstate commerce of a sawed-off shotgun. The law was upheld, there being no evidence that a sawed-off shotgun had "some reasonable relationship to the preservation or efficiency of a well regulated militia." Id., at 178, 59 S.Ct., at 818. The Second Amendment, it was held, "must be interpreted and applied" with the view of maintaining a "militia."
407 U.S. 150, 92 S.Ct. 1923, 32 L.Ed.2d 619.
[2] This case is not unlike the situation recently presented to this court in Newton v. State, 378 So.2d 297 (Fla. 4th DCA 1979). In Newton, a narcotics arrest was effected in one room of a house. This court held that, in the absence of "some reasonable grounds to suspect additional persons may be present", the police were not within their rights in searching the remainder of the house:

We must concede that a protective sweep of premises when an arrest is taking place would seem the circumspect thing to do for the protection of the officers involved. However, sensible as that may seem such a protective measure is only allowable when the officers have some reasonable grounds to suspect additional persons may be present. It cannot be justified routinely. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), holds that, while there is ample justification for a search of the arrestee's person and the area within his immediate control, "[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs...." Supra 762, 89 S.Ct. 2040. In order to justify an extension of the search to other rooms, be it ever so cursory, there must be some exigent circumstances constituting the reasonable grounds therefor.
Newton v. State, supra, at 299.
In fact, I believe a much stronger argument could be made for extending the Mimms rationale to the protective sweep situation than to the search involved herein.
[3] The majority also relies on Stevens v. State, 354 So.2d 110 (Fla. 3d DCA 1978). Although I believe the decision in Stevens is questionable, the facts therein are also distinguishable. In that case, an intoxicated detainee in the clear view of a police officer attempted to grab an object wrapped in a towel lying beside him on the front seat. The defendant here did no more than announce that he was going to retrieve his car keys so he could show the officers the flat tire in his trunk. Under the majority holding, any attempt by a detainee to return to his vehicle would authorize a protective search of the vehicle. Hence, presumably, a detainee can not only be required to exit his vehicle for the security of the officer (under Mimms, supra) but also must suffer a search of his vehicle before being allowed to reenter the vehicle.