Archie P. DICKERSON, Appellant,

v.

UNITED STATES, Appellee.

No. 6212.

District of Columbia Court of Appeals.

Submitted June 27, 1972.

Decided Nov. 10, 1972.

Donald A. Couvillon, Washington, D. C., for appellant.

Harold H. Titus, Jr., U. S. Atty., John A. Terry, William M. Brodsky, E. Lawrence Barcella, Jr., and James F. McMullin, Asst. U. S. Attys., for appellee.

Before GALLAGHER and NEBEKER, Associate Judges, and HOOD, Chief Judge, Retired.

HOOD, Chief Judge, Retired:

This appeal is from a conviction of carrying a pistol without a license.[1] Finding the pistol to have been the product of an unlawful search, we reverse.

Appellant, operating an automobile bearing temporary Virginia tags, was stopped by the arresting officers because the tags appeared old and faded and also gave the appearance of having been altered. Appellant's driver's permit was in order but the car's registration gave evidence of alteration by change of date and closer inspection of the front and rear tags revealed apparent alteration of dates. As it is a violation of the traffic regulations to drive a car with outdated tags, appellant was ordered to get out of his car and into the police car with the other officer, and the arresting officer entered appellant's car. The intent was that the arresting officer would drive appellant's car to the police station while appellant was being taken there in the police car. Appellant quietly

1. D.C.Code 1967, § 22-3204.

and promptly complied with the officers' requests and instructions.

After entering appellant's car and observing nothing unusual in the car, the officer started the motor and then reached under the seat and found a loaded .38 caliber revolver. He then returned to the police car, ordered appellant to get out, frisked him, and then placed him under arrest for carrying a pistol without a license.

Appellant concedes that the officer had probable cause to arrest him for the traffic violation, i. e., for having altered license plates, but argues that the officer had no right to make the search which produced the pistol.

The officer's explanation for reaching under the seat was that he had been taught that the "normal hiding place for any type of narcotics, weapons or such" was under the front seat, and that "just out of habit I reached under the front seat."

In the recent case of United States v. Green, 465 F.2d 620 (D.C. Cir. 1972), Judge Tamm, speaking for the majority, said that "the law with regard to a search incident to an arrest for a traffic violation remains unsettled," and he cites numerous authorities and cases on the subject. This court has recognized that there are limitations on the right to search incident to a traffic arrest. *See* Mayfield v. United States, D.C.App., 276 A.2d 123 (1971) and cases there cited.

Here the search was not for fruits of the offense because there were none. It was not for evidence of the offense because the officers already had the altered tags and registration. It was not a protective search for weapons because appellant had already been removed from his car and placed in the police car. No action by appellant had indicated an attempt to conceal contraband in the car, and the officers had no reason to believe that the car contained weapons or other contraband. As the officer frankly admitted, he searched under the seat simply out of habit.

Under present conditions, when the illegal carrying of guns is so prevalent, it is hard to fault the officer for his actions; but under established authority we must hold that his action constituted an illegal search.

Reversed with instructions to enter a judgment of acquittal.

NEBEKER, Associate Judge (concurring):

I concur in the holding of the court in this case because the case law applicable to these facts compels it. I wonder, however, whether contemporary application of the suppression doctrine does not overemphasize the question of the reasonableness of the officer's action as it relates to an intrusion on constitutional rights *vel non*, and excludes consideration of other relevant factors. While no one questions that an officer of the state must, in relation to a citizen, act reasonably under the circumstances, it may also be that the suppression rule might be applied without doing violence to the Fourth Amendment with some deference to reasonableness in relation to the degree of intrusion by the officer and the extent of his good faith. Indeed, with so much judicial deliberation and time expended in evaluating split-second judgments by police, this area of constitutional interpretation could well become justifiably subject to the kind of criticism the utilitarian Jeremy Bentham leveled at eighteenth century English law. In being most critical of what he viewed as technical judge-made law of that time, he compared it to law which one makes for his dog, ". . . you wait till he does it and then beat him . . . this is the way judges make laws for you and me."[1] The effect of the holding in this case is to "beat" the

---

1. 1 L. Stephen, The English Utilitarians, 279 (1900).

**710**

officer and thus the state for doing something that we now say was wrong, but which in total context was not wholly unreasonable or a gross intrusion on personal security, and certainly not rooted in bad faith.

The officer said that in "my particular district, I have been taught that that's the normal hiding place for any type of narcotics, weapons or such, and just out of habit I reached under the front seat." Experience in numerous cases in most courts vindicate that lesson. Because reaching under the front seat while lawfully having custody of the car cannot be justified by what we deem to be the equivalent of "specific and articulable facts" [2]—that the reach was for security purposes or reasonably aimed at contraband—we hold that a constitutional right has been violated. We do not stop to consider whether this reach beneath the seat was in good faith and based on experience, as is the case here, or whether the reach was born of a callous and vindictive frame of mind. We do not stop to consider whether the intrusion is of minor or major proportions.[3] Looking to this single aspect of reasonableness, we afford this appellant total immunity from prosecution.

Perhaps there will come a time when legislation or interpretative decision will apply the suppression rule under the Fourth Amendment by balancing the reasonableness of the officer's conduct in the specific situation with the degree and nature of the intrusion and the consequences of suppression. It may be that at the same time there must be created other effective sanctions which can deal appropriately with police misconduct in proportion to the extent of and motivation for the intrusion.

---

2. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. Some support for measuring the degree of the intrusion can be found in Terry v. Ohio, *supra* note 2, where that Court characterized the "traditional responsibility" of courts as guarding against "overbearing or harassing" police conduct. *Id.*

at 15. To be sure, that opinion also spoke of conduct which "trenches upon personal security without objective evidentiary justification". But when read in context with the phrase "overbearing or harassing" it would seem that the Supreme Court may have had in mind a weighing of the degree of intrusion.