**UNITED STATES, Appellant,**

**v.**

**James W. THOMAS and Walter L. Sutton, Appellees.**

**No. 6758.**

District of Columbia Court of Appeals.

Argued Jan. 16, 1973.

Decided Jan. 31, 1974.

4. *See also* Instruction No. 62, Standardized Jury Instructions for the District of Columbia, 48 (Rev. ed. 1968).

James W. Diehm, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Stuart M. Gerson, Asst. U. S. Attys., were on the brief, for appellant.

William Jordan Temple, Washington, D. C., appointed by this court for appellee Thomas, did not brief or argue the case.

Robert Case Liotta, Washington, D. C., appointed by this court, for appellee Sutton. His brief and oral argument were accepted on behalf of both appellees.

Before NEBEKER, PAIR, and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellees were charged with carrying a pistol without a license (D.C.Code 1973, § 22–3204) and receiving stolen property (D.C.Code 1973, § 22–2205). A motion to suppress the gun as evidence was granted by the trial court; the government appeals pursuant to D.C.Code 1973, § 23–104(a). We conclude that the search and seizure were reasonable under Fourth Amendment standards, and reverse.

The only witnesses at the suppression hearing were two police officers; neither defendant chose to testify. At the conclusion of the hearing, the trial court stated: "I applaud the officers. I find the facts as testified by Officer Davis, I think the officers are honest, straightforward and I am impressed by their testimony. It was good police work." The basis for the trial court's suppression ruling was its belief that the search for, and seizure of, the pistol were constitutionally impermissible since the police appeared at the time to enjoy tactical superiority over the suspects. In our view, however, relative tactical strength is not a controlling factor in circumstances such as those presented here.

■ The basic facts of record were not in dispute below and remain undisputed.[1] At approximately 2:00 a. m. on a Sunday morning, three Tactical Squad officers (from the Metropolitan Police force's Second District) were on duty in Georgetown.[2] Their car was unmarked;

---

[1]. In his dissent, our brother takes the position that he is viewing the evidence "in the light most favorable to the appellees." We respectfully suggest that he is evaluating the record through his own eyes rather than through those of the trained and experienced police officers who were on the scene, and rejecting essentially unavoidable inferences from the facts. We have no quarrel with the authorities upon which he relies in his footnote 1, but consider them inapposite since this case contains no factual questions. *See* Commonwealth v. Pugh, 223 Pa.Super. 112, 296 A.2d 864, 865–866 (1972). *Cf.* Smith v. United States, D.C.App., 295 A.2d 64, 67 (1972); Jenkins v. United States, D.C.App., 284 A.2d 460, 462 (1971).

The trial court faced, and we now face, solely the legal question of the reasonableness of the search and seizure in light of unchallenged testimony. We are "obligated to exercise [our] independent judgment on the underlying constitutional issue presented by the facts of this case", and are "not free" to disregard uncontradicted evidence which was fully accepted by the trial court. Cady v. Dombrowski, 413 U.S. 433, 443, 93 S.Ct. 2523, 2529, 37 L.Ed.2d 706 (1973).

[2]. The assignment of Tactical Squad officers includes the prevention of offenses such as robbery and burglary, as well as the investigation of committed offenses of that nature.

they were dressed in casual clothes. When the relevant events began to occur, two of the officers were away from the car, checking a nearby automobile dealer's premises. Officer Samuel K. Meregian was seated alone in the police car, which was parked at the intersection of 33d and Prospect Streets, N.W. There had been numerous robberies in the area. Officer Meregian's attention was attracted to a Ford Thunderbird which passed through the intersection twice within five minutes. After it crossed the intersection the second time, it stopped, and two men got out. One was appellee Thomas; the other was named Banks.

Immediately suspicious, Officer Meregian radioed for a computer check on the Thunderbird's license number to determine whether the car had been stolen. As he watched from diagonally across the intersection, the two men surreptitiously began to follow two women who were walking up 33d Street. The officer testified that "there were tree boxes and Mr. Thomas and Banks were hiding in the space between the trees and the sidewalk as to make a pry [*sic;* presumably "prey"] on the victim[s]." [3]

Meanwhile, the driver of the Thunderbird (appellee Sutton) made a U-turn, parked near the intersection, and turned off the car's lights. Sutton then blew the car's horn, which attracted the attention of the men who were shadowing the women. The men turned, and one of them pointed to the darkened car in which Officer Meregian was seated (apparently unobserved prior to that time). Sutton "appeared to summon the other two gentlemen." He quickly drove up 33d Street, picked up the two men, and left the scene.

At that point, Officer Meregian's two partners returned to their car. Meregian described what had been happening and expressed his suspicions. The police drove up 33d Street in an effort to locate the Thunderbird. As Meregian turned east on N Street, he saw its tail lights. A high-speed chase began, the exact route of which was not made clear on the record. The Thunderbird was pursued at speeds in excess of 50 miles per hour along congested streets; on several occasions it passed cars while traveling on the wrong side of the road. During the chase, while only five or six car lengths behind the Thunderbird, Officer Meregian observed the person

---

3. The excerpt from the testimony of Officer Meregian which is quoted in the dissent makes it appropriate to set forth that portion of the cross-examination which immediately preceded it:

Q. Now was it at this point that you observed Mr. Banks and Mr. Thomas following these two ladies?

A. Yes, sir; they got out of their vehicle and walked north on 33rd Street from Prospect right behind them.

Q. And how long a period of time occurred while they were following these two ladies? How much time elapsed?

A. A very short period, sir.

Q. You mentioned they were lurking in a tree boxes? [*Sic.*]

A. That is right.

Q. That aroused your suspicion; did it not?

A. Yes, sir, we have had numerous robberies in that general area.

Q. And you were just a few hundred yards away; is that correct?

A. Oh, no, sir, I would say it was just a hundred feet.

Q. A hundred feet?

A. I would say less than a hundred feet.

Q. And you suspected there was criminal activity afoot?

A. Yes, sir.

Q. Did you get out of your car again?

A. No, sir.

Q. Now, weren't you afraid for these two ladies walking up 33rd Street?

A. Yes, sir.

Q. You didn't get out of your car?

A. There had not been no physical contact from the suspects to the victims—alleged victims.

Q. You were now waiting for them to mug them, or what?

A. No, sir, I was waiting until I had another unit there or disposition back on the tag first.

Q. When did you get disposition back on the tag?

A. While they were present on the scene. [Officer Meregian received word that the Thunderbird was not listed as stolen.]

in the right front seat of the Thunderbird (appellee Thomas) leaning forward "periodically" with his head toward the floor. He called that activity to the attention of one of his partners, Officer James W. Davis. The Tactical Squad officers did not attempt to stop their quarry, but called for assistance on their radio. A marked cruiser stopped the Thunderbird in the 1700 block of I Street, N.W.; a third police vehicle arrived on the scene almost immediately.

While the four suspects were still in the Thunderbird, and before Officer Meregian and his partners got out of their vehicle, Officer Meregian told Officer Davis to check the area of the right front seat of the car (where appellee Thomas had leaned over during the chase) "for his self-preservation." Officers approached the Thunderbird and ordered the occupants to get out. They did so, two on each side. They apparently were frisked, and Officer Davis approached the open passenger door. He reached into the car, feeling under the front passenger seat with his left hand and under the glove compartment with his right hand. A pistol was recovered from behind the glove compartment; it later was determined that the gun had been stolen from the Metropolitan Police Department. Both appellees, who were the two men in the front seat, were charged with carrying a pistol without a license and receiving stolen property.

■ Those are the basic facts.[4] In determining whether the limited search of

the car which resulted in the seizure of the stolen pistol was reasonable, we must analyze all of " 'the facts and circumstances— the total atmosphere of the case,' . . . in the light of established Fourth Amendment principles." [5] In the process of that analysis, we must give due recognition to how the total circumstances appeared to cautious and prudent police officers. *See* Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); cf. Lucas v. United States, D.C.App. 256 A.2d 574, 575 (1969); Jackson v. United States, 112 U. S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962).

■ When appellee Thomas and his partner alighted from their car at 2:00 a. m. that morning, they immediately began to stalk two female pedestrians. At that point, unquestionably Officer Meregian was empowered to investigate the subjects' suspicious conduct. Terry v. Ohio, *supra.* Alone and outnumbered, Meregian determined to await a response to his stolen car inquiry and the return of his partners. The abrupt departure of the suspects postponed the opportunity for a confrontation, but the ensuing events (including the high-speed chase and the gestures by appellee Thomas in the front passenger seat) heightened the officers' wholly reasonable belief that they were dealing with potentially dangerous would-be lawbreakers.

■ The circumstances clearly warranted stopping the car, either for a *Terry*-type investigation or for a variety of flagrant traffic offenses.[6] When the car

4. It is stated in the dissent that the evidence "establishes little more than that appellees and their two companions were observed riding in a Ford Thunderbird automobile through the streets of Georgetown at an early hour of the morning, and that they were pursued by unidentified persons riding in an automobile which had none of the indicia usually associated with a police vehicle." After so interpreting the record, our brother relies principally on various quotations from what might be described as routine traffic cases. If this were a routine traffic case, the cases cited in the dissent might well be relevant. However, we consider the decisions relied upon by him to be inapposite, and do not feel that it is necessary to deal with them individually.

5. Chimel v. California, 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969), citing United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653 (1950); see also United States v. Davis, 147 U.S.App. D.C. 400, 458 F.2d 819 (1972); Davis v. United States, 133 U.S.App.D.C. 172, 174, 409 F.2d 458, 460, cert. denied, 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969).

6. During the suppression hearing, Officer Meregian was asked whether he had cited appellee Sutton for the traffic violations which were committed. He replied: "No sir; I don't write traffic offenses."

was stopped, unquestionably Officer Davis' limited search—and the resulting seizure of the stolen pistol—would have been reasonable if it had been conducted while the four suspects were still in the car. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, *supra; see* Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The narrow issue presented by this appeal may be stated: Did removal of the suspects from their car made unreasonable the search which would have been reasonable had they remained in it? We conclude that it did not.[7]

In Terry v. Ohio, *supra,* the Court dealt specifically with a limited protective search of a pedestrian. However, the principles enunciated in that case are wholly consistent with the concept that an automobile's passenger compartment may be the subject of a limited search, in circumstances such as those presented here, for the protection of officers who otherwise might be endangered if the occupants were permitted to reenter the vehicle at the end of an investigative inquiry. The Court stated in *Terry* (392 U.S. at 23, 88 S.Ct. at 1881):

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.

It is to be expected that persons who are being pursued by police officers will seek to hide contraband such as an illegal weapon. See McGee v. United States, D.C. App., 270 A.2d 348, 350 (1970). In our view, as suggested in the above-quoted language from *Terry,* it would be unreasonable to require officers to take the unnecessary risk of leaving suspects in their car while making a limited protective search of the readily accessible areas of an automobile's interior. This concept was recognized specifically by the Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), which dealt extensively with warrantless searches of automobiles. It there was stated (*id.* at 461, n. 18, 91 S.Ct. at 2035):

> Of course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it, the police may make a search of appropriately limited scope.[8] [Footnote added.]

In this case, a virtual plethora of articulable suspicions existed which justified the

---

7. The obvious differences between the warrantless search of an automobile and a house for constitutional purposes, were recognized early in Carroll v. United States, 267 U.S. 132, 153–154, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and have continued to be recognized, *E. g., see* Cady v. Dombrowski, *supra,* 413 U.S. at 439–442, 93 S.Ct. 2523; Chambers v. Maroney, 399 U.S. 42, 48–52, 90 S.Ct. 1975, 26 L.Ed. 2d 419 (1970). The Supreme Court stated in Cooper v. California, 386 U.S. 58, 59, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967):

> We made it clear in Preston [v. United States, 376 U.S. 364, 366–367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964)] that whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case and pointed out, in particular, that searches of cars that are constantly movable may make the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store, or other fixed piece of property.

8. In Daygee v. State, 514 P.2d 1159 (1973), the Supreme Court of Alaska recently stated (at 1166):

> The search of the vehicle should not depend on whether or not the person or persons arrested are in the car or have been recently removed from the car for the purposes of effectuating an arrest. We reach this conclusion because it would be an unusual situation for a police officer not to remove a suspect from a car while going through the arrest process, both for reasons of safety and because of the practical physical limitations of effecting an arrest in such a confined area.

steps taken by the officers. The limited search of the car was both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, *supra*, 392 U.S. at 19–20, 88 S.Ct. at 1879; *see* Jeffreys v. United States, D.C. App., 312 A.2d 308 (1973); Young v. United States, 140 U.S.App.D.C. 333, 435 F.2d 405 (1970).[9] As the Supreme Court stated in Adams v. Williams, *supra*, 407 U.S. at 146, 92 S.Ct. at 1923:

> So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose. [Footnote omitted.]

To this point, we have dealt essentially with those decisions of the Supreme Court which lead us to our conclusion. Additionally, there are two decisions within this jurisdiction which lead to the same result. They are this court's opinion in McGee v. United States, *supra*, and the Circuit Court's opinion in United States v. Green, 151 U.S.App.D.C. 35, 465 F.2d 620 (1972). In both of those cases, police officers pursued routine traffic offenders, and observed gestures which led the officers to believe the subjects might be armed. In each case the offender was stopped and directed out of his car, following which a limited search of the car revealed a gun. In neither case was the suspect formally placed under arrest prior to the fruitful search for the gun. Both searches were held to be reasonable. In *Green*, the court stated (*id.* at 40, 465 F.2d at 625):

> The officer first conducted a limited "frisk" for weapons upon the person of

appellant. He then went to the car and recovered a fully-loaded pistol from under the driver's seat where he reasonably expected it to be. The officer did not search the trunk, glove compartment or back seat. His search was not general or exploratory, but rather limited to the danger at hand. The search under the driver's seat of an open-door vehicle to which the driver will return is a search of an area under the immediate control of the driver.[10] [Footnote added.]

In concluding, we echo one thought expressed in Terry v. Ohio, *supra* (392 U.S. at 15, 88 S.Ct. at 1876):

> Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere. Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires.

That principle remains inviolate. However, in no objective sense could the effective, responsible action of the police officers in this case be labeled overbearing or harassing—terms, incidentally, which are the antitheses of reasonableness. Considering the totality of the circumstances, the limited search which resulted in the seizure of the pistol was constitutionally permissible. *Cf.* United States v. Ragsdale, 470 F. 2d 24 (5th Cir. 1972); United States v. Brooks, 310 F.Supp. 289 (E.D.Ark.1970). The motion to suppress having been granted erroneously, the order to such effect is reversed and the case is remanded.

Reversed and remanded.

9. The Circuit Court stated in *Young* (*id.* at 337, 435 F.2d at 409):
> All the law requires is that [an officer] have reasonable basis for believing that his safety or the safety of others requires a search or seizure.

10. In Adams v. Williams, *supra*, the Supreme Court further stated (407 U.S. at 148, 92 S.Ct. at 1925):
> Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.

PAIR, Associate Judge (dissenting):

The result reached by the majority in this case is, in my opinion, contrary to well established law in this jurisdiction.

I read the record quite differently from my associates on the panel. Viewing the evidence—as we must—in the light most favorable to the appellees,[1] it establishes little more than that appellees and their two companions were observed riding in a Ford Thunderbird automobile through the streets of Georgetown at an early hour of the morning,[2] and that they were pursued by unidentified persons riding in an automobile which had none of the indicia usually associated with a police vehicle.

What the record shows is that Officer Meregian, dressed in casual clothes, was seated in an unmarked police car, parked near the intersection of Prospect and 33rd Streets, N.W., and observed a Thunderbird automobile proceeding in an easterly direction on Prospect Street. A short time thereafter he again observed the automobile proceeding through the intersection in the same direction. The automobile was then observed to stop and two men alighted and walked in a northerly direction on 33rd Street. Observed also were two women walking ahead of the two men in the same direction.[3]

During the cross-examination of the officer, the following transpired:

Q. Did you then get out of your car and approach Mr. Banks and Mr. Thomas?

A. No, I did not.

Q. How close did they get to the two ladies?

A. I would say approximately 15 or 20 feet.

Q. And when were they in the tree box?

A. Just a few feet above the intersection of 33rd and Prospect.

Q. And that didn't arouse your suspicion or cause you to get out of the car and approach them?

A. No, the alleged victims were out of the area, I did not see them, but saw the two suspects just above the intersection at 33rd Street.

In the majority opinion it is said that:

When appellee Thomas and his partner alighted from their car at 2:00 a. m. that morning, they immediately began to stalk two female pedestrians. At that point, unquestionably Officer Meregian was empowered to investigate the subjects' suspicious conduct. Terry v. Ohio, supra.

The simple answer to this is, of course, that the officer did not confront the two men; in fact, he was apparently not sufficiently concerned to even get out of his automobile.

The officer testified further that the automobile was turned and headed in a

---

1. The majority is apparently of the view that, although the appellees were the prevailing parties in the trial court, on appeal the record must nevertheless be viewed in the light most favorable to the government. But the well settled law is to the contrary. It is always the prevailing party who is entitled to the presumption that the ruling challenged on appeal is correct and to this end the record must be viewed in the light most favorable to such prevailing party. See Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); Hallman v. United States, 115 U.S.App.D.C. 350, 320 F.2d 669, cert. denied, 375 U.S. 882, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963); Campbell v. United States, 115 U.S.App.D.C. 30, 316 F.2d 681 (1963); Smith v. United States, D.C.App., 295 A.2d 64, 67 (1972); Jenkins v. United States, D.C.App., 284 A.2d 460, 462 (1971); Malloy v. United States, D.C.App., 246 A.2d 781, 782 (1968).

2. The officer made a note of the license tag number and obtained almost immediately a report indicating that the vehicle had not been stolen and that no traffic warrant was outstanding.

3. The officer observed no contact of any kind between the two men and the two women.

westerly direction on Prospect Street at 33rd Street where it was parked. The officer stated that the lights went out, the horn was sounded, and he "observed the two subjects [who] disembark[ed] from the vehicle initially turn back and one pointed to the police vehicle." The automobile then proceeded in a northerly direction on 33rd Street and the two passengers who had alighted earlier from the vehicle were presumably picked up.

Officer Meregian, who in the meantime had been rejoined by two other officers also dressed in casual clothes, then proceeded in the police car in an effort "to get behind" the automobile but when they reached 33rd Street it was not in sight. The officers then proceeded in an easterly direction on N Street and observed some distance ahead "the tail lights of a vehicle moving at a rapid rate of speed on the wrong side of the roadway.[4] Officer Meregian stated that although some five or six car lengths to the rear of the automobile, he was able to observe the body of the passenger in the right front seat "bent over in the front seat where the top of his head or his head was facing toward the floorboard."

Making no attempt to stop the automobile, the three officers requested assistance, and the uniformed officers who responded finally stopped the automobile in the 1700 block of Eye Street, N.W.[5] The automobile was then immediately surrounded by police officers and all of its occupants were required to get out, after which they were escorted to the rear of the automobile where, in the custody of at least four police officers, they were frisked. One of the officers then searched the front passenger area of the automobile and a weapon was found under the dashboard behind the glove compartment.

At argument on the motion to suppress the weapon, the government conceded that there was no evidence (1) that the operator of the automobile in which the appellees were riding could not have, if requested, presented a valid license and registration for the automobile, (2) that he was given a citation for any traffic offense, or (3) that there existed probable cause to arrest the operator of the automobile or any one of the passengers or to impound the automobile.

The government insisted nevertheless that the police had the right to search the vehicle as a protective measure. The trial court—unpersuaded—suppressed the gun and, in my opinion, that ruling was correct. It is so well settled now as to hardly require the citation of authority that any search or seizure conducted without a warrant is "per se" unreasonable under the Fourth Amendment—subject only to few well identified exceptions, none of which is to be found in this factual setting. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); accord, Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971); Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

In Watts v. United States, D.C.App., 297 A.2d 790 (1972), the court sought to make it crystal clear that the police have no right to make an exploratory search of an

---

4. It is a matter of general knowledge that N Street in that area is narrow, it has no center line and parking is permitted on both sides of the roadway.

5. Aside from his observations at and near the intersection of 33rd and Prospect Streets,

N. W., the officer gave no explanation for his decision to pursue the automobile and, with the assistance of other officers, cause it to be stopped. Strangely enough, the automobile was never identified as the same automobile observed by the officer at Prospect and 33rd Streets, N. W.

automobile even as an incident to a traffic arrest,[6] saying at 792:

> When the search is made without a warrant, it must be with probable cause or bear some reasonable relationship to the crime for which the arrest is made or to the safety of the officer if it is to come within one of the exceptions to the warrant requirement described in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) . . . .

The Supreme Court recently reemphasized all of this when, in Almeida-Sanchez v. United States, *supra*, it declared at 269 of 413 U.S., at 2537 of 93 S.Ct.:

> [T]he Carroll doctrine[7] does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search. As *Mr. Justice White* wrote for the Court in Chambers v. Maroney, . . . . "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement . . . ." [Footnote omitted.]

*See also* Annot., Warrantless Search of Automobile, 26 L.Ed.2d 893 et seq.

The majority suggests that because of the confluence of such considerations as "numerous robberies in that general area", the late hour, the furtive gesture and the attempted flight through congested traffic, the search and seizure were justified and therefore reasonable. But mere suspicion that an automobile is operated in furtherance of some criminal activity is not, without more, sufficient to support a warrantless search of either the automobile or the passengers. In Tyler v. United States, D.C.App., 302 A.2d 748 (1973), the court, addressing a somewhat similar factual situation, said at 752:

Neither does the search appear to be reasonably related to the protection of the officers. "[T]he officers had no complaint or report of a crime, had never seen appellant before and did not observe him engage in unlawful conduct." Robinson v. United States, D.C.App., 278 A.2d 458, 459 (1971). There was no reason to think that appellant was about to become the subject of a custodial arrest which would warrant the officers taking reasonable steps to protect themselves. He was standing at the time in front of the car with a third officer so that the contents of the car posed, at most, a minimal threat to the officers. [Footnote omitted.]

In the case at bar, as in *Tyler*, it is urged that it was the furtive gesture that put the officers on guard and provoked the intrusion into the automobile. However, the inescapable fact is that the search of the automobile was made after its four occupants had been escorted to the rear of the automobile where they remained in the custody of at least four other police officers. Certainly, therefore, it cannot be seriously contended that the search was reasonably related to the protection of the officers.

Moreover, it can hardly be assumed that appellees were knowingly fleeing the police since the three officers in the pursuing car were not in uniform, their vehicle was unmarked, and no siren was sounded or device displayed. Thus only by the most tenuous reasoning could it be concluded that this case is controlled by McGee v. United States, D.C.App., 270 A.2d 348 (1970), upon which the majority relies in reversing the trial court. In that case the search incident to a valid arrest was clearly for the protection of the police officer and, therefore, distinguishable on its facts, not only from the case at bar but also from Tyler v.

---

6. Here appellees were not accused of criminal conduct; in fact, they were not even charged with a traffic offense, nor was the operator of the automobile called upon to exhibit either his permit or the registration of the vehicle. Demonstrated in this record, therefore, is the very police conduct so sharply condemned in *Coolidge, supra.*

7. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

United States, *supra*, and Watts v. United States, *supra*.

In Dickerson v. United States, D.C.App., 296 A.2d 708 (1972), the defendant was under arrest charged with traffic violations. After he had been removed from his car and placed in a police vehicle, the officer reached under the seat of defendant's car and found a gun. The search was held to be illegal. To the same effect was United States v. Page, D.C.App., 298 A.2d 233 (1972). There a vehicle was stopped for speeding and the officers observed the passenger in the right front seat move as if to hide something. The officer, apparently concerned for his safety, ordered the passenger to leave the vehicle and, upon compliance, he was frisked and a gun was found on his person. We upheld the trial court's suppression order agreeing that there was no probable cause to search the passenger. The government in Page, as in Watts and Tyler, relied on United States v. Green, 151 U.S.App.D.C. 35, 465 F.2d 620 (1972), and the *McGee* case as support for a general search, but we rejected the claim—as have other courts. *See* United States v. Humphrey, 409 F.2d 1055 (10th Cir. 1969); People v. Superior Court of Yolo County, 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970).

The conclusion is thus compelled that this case is simply one more instance of overzealous police activity. Unfortunately it cannot be justified on any theory of "furtive gestures" or legitimate protective measures. Thus, wholly apart from my differences with the majority as to what the record reveals or as to what law controls, Judge Wright's observation dissenting in United States v. Green, *supra*, is especially apt here:

This is a disarmingly simple case, but the court's disposition of it, in my judgment, jeopardizes the privacy and the constitutional rights of every citizen who drives a car in the nation's capital. . . . [465 F.2d at 625.]

But even more appropriate is the language employed by Mr. Justice Stewart

speaking for the majority in Almeida-Sanchez v. United States, *supra*, 413 U.S. at 274, 93 S.Ct. at 2540: The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

"These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among [the] deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." Brinegar v. United States, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (Jackson, J., dissenting).

I would affirm the suppression order entered in this case and, accordingly, respectfully dissent.