Toney M. THOMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1042.

District of Columbia Court of Appeals.

Submitted May 18, 1988.

Decided Jan. 27, 1989.

Richard S. Stolker, Rockville, Md., appointed by this court, was on the brief for appellant.

Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell, Mary Ellen Abrecht, Mark H. Du-

1. D.C.Code § 22–3203(a)(2) (1981).

2. D.C.Code § 23–1327(a) (1981).

bester, and Thomas J. Kelly, Jr., Asst. U.S. Attys., were on the brief for appellee.

Before NEWMAN, BELSON, and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant Thomas was convicted of unlawful possession of a pistol after conviction of a felony[1] and bail jumping.[2] His only contention on this appeal is that the trial court erred in denying his motion to suppress the pistol, which was seized from the trunk of a car he was driving. We hold that the search of the trunk was based on probable cause, and accordingly we affirm the judgment of conviction.

I

In July 1984 Sergeant Francis L. Hinton, a sixteen-year veteran of the Metropolitan Police, was an automobile theft investigator assigned to the Third District. He testified that in looking for stolen cars, he focused particularly on "the appearance of the drivers ... the appearance of the vehicles, and the manner in which the vehicle was operated." He also paid special attention to rental cars, which can be identified both by their license numbers and by window stickers bearing the name of the rental company. Rental cars are popular among car thieves, Hinton said, because they often are not reported stolen until they have been missing for at least thirty days. That summer the Hertz Corporation in particular had been experiencing thefts of its cars in Virginia, which the thieves would then sell, he said, to "unsuspecting" buyers in the District of Columbia.

On July 25, at about 3:00 p.m., Hinton and his partner, Officer Dale Hughes, were in Hughes' car (not a police car) at the intersection of Fairmont Street and Sherman Avenue, N.W., when he saw a Hertz rental car drive over a large pothole or depression in the street without slowing down. Noticing that the driver—appellant —"appeared to be under twenty years of age,"[3] Hinton and Hughes began to follow

3. Hinton's suspicions were aroused by appellant's youthful appearance because he knew that rental companies do not usually rent their cars

the Hertz car. At 11th and Fairmont Streets they saw it run a stop sign. It turned north on 11th Street and, taking a circuitous route (another suspicious circumstance, in the eyes of Sergeant Hinton), it sometimes exceeded the speed limit by as much as fifteen miles per hour. Hinton also noticed that the car, a white Mercury, had dirt on it, and he knew that rental cars are usually clean when rented.

Hinton and Hughes radioed for assistance in stopping the car,[4] and in the 1600 block of Kalorama Road two police cruisers pulled it over. As appellant got out of the car of his own volition, Officer Charles Callis approached on the passenger side and asked the two passengers, Leon Bullock and Parker Farrow, to get out also. When Bullock alighted from the right front seat, Callis saw a ski mask, with the eye and mouth holes facing up, sticking out of a cloth bag in plain view on the floor next to the seat. Officer Callis thought it "very unusual" for anyone to have a ski mask on a hot day in July. Knowing that ski masks are commonly used by the perpetrators of holdups to conceal their identity, Callis reached down and picked up the ski mask to examine it more closely. As he did so, the bag fell over, and Callis heard the clank of metal against metal, "a heavy sound like ... you would get from guns." Callis looked inside the bag and saw three revolvers. All the officers on the scene then conferred and decided to search the trunk of the car for possible robbery proceeds, additional weapons, or drugs. Their search

yielded a .25 caliber pistol, which they found in a bag in the trunk along with various articles of clothing.

After hearing the testimony of Sergeant Hinton and Officer Callis (appellant offered no evidence) and the arguments of counsel, the trial court denied appellant's motion to suppress the gun found in the trunk. The court ruled that Officer Callis, upon seeing the ski mask on a very hot day in July, and knowing "that ski masks are commonly used in holdups, which means that weapons would be involved," acted reasonably in making "a limited protective [frisk] of the bag" in which the ski mask was found. The discovery of the guns in the bag, the court continued, gave the police probable cause to search the rest of the car. Relying on *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the court denied appellant's motion to suppress the gun found in the trunk.[5] It was that gun which appellant was convicted of unlawfully possessing.[6]

II

The critical event in this case was Officer Callis' discovery of the three guns in the bag underneath the ski mask.[7] That discovery led directly to the search of the trunk and the seizure of the pistol on which appellant's conviction was based. We hold that, in the circumstances of this case, it was reasonable for Officer Callis to look in the bag for weapons after seeing the ski mask, and that when he found the three

---

to persons under twenty-five years of age. He later acknowledged, however, that a person under twenty-five can rent a car if he or she has a valid credit card.

4. Hinton testified that police regulations prohibited officers on plainclothes duty in an unmarked car from stopping another car.

5. The court also referred to *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). *Belton*, however, would not support the search of the trunk. *See id.* at 460–461 & n. 4, 101 S.Ct. at 2864–2865 & n. 4.

6. Appellant was also charged with carrying without a license the three pistols concealed in the bag under the ski mask, in violation of D.C.Code § 22–3204 (1981), but the jury acquitted him of that charge.

7. The police were justified in stopping the car because of the two traffic violations, running a stop sign and exceeding the speed limit. *Marbury v. United States*, 540 A.2d 114, 115 (D.C. 1985); *Punch v. United States*, 377 A.2d 1353, 1356–1357 (D.C.1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). Ordering the occupants of the car to get out, which enabled Officer Callis to see the bag with the ski mask in it, was likewise permissible. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 333 n. 6, 54 L.Ed.2d 331 (1977) (driver); *United States v. Ordway*, 329 A.2d 776, 778 (D.C. 1974) (passenger); *see King v. United States*, 550 A.2d 348, 357 (D.C.1988) (characterizing officer's telling defendants to step out of car as "a very minor intrusion").

guns, he and his fellow officers had probable cause to arrest the occupants of the car and to search the trunk.[8]

When a police officer has a reasonable suspicion, based on specific and articulable facts, that a person may be armed, the officer may conduct a limited search or frisk for weapons, even without probable cause for a full-blown search or arrest. *Terry v. Ohio*, 392 U.S. 1, 20–27, 88 S.Ct. 1868, 1879–1883, 20 L.Ed.2d 889 (1968); *see Michigan v. Long, supra* note 8, 463 U.S. at 1045–1049, 103 S.Ct. at 3479–3481 (*Terry* frisk of car driver may include examination of car for weapons); *Adams v. Williams*, 407 U.S. 143, 145–147, 92 S.Ct. 1921, 1922–1924, 32 L.Ed.2d 612 (1972) (applying *Terry* to search of person in car); *Marbury v. United States, supra*, 540 A.2d at 116 (applying *Terry* to search of person ordered out of car). Whether the suspicion is reasonable will often depend on the inferences drawn from the particular circumstances confronting the officer, viewed in the light of his or her experience. *Terry v. Ohio, supra*, 392 U.S. at 21–22, 27–30, 88 S.Ct. at 1879–1880, 1883–1884; *see Offutt v. United States*, 534 A.2d 936, 938 (D.C.1987). Applying these well-settled principles to the facts of this case, we are fully persuaded that Officer Callis was justified in conducting a *Terry* frisk of the bag with the ski mask in it.

The presence of a ski mask in a car in July does not absolutely show criminal activity afoot.[9] The ski mask could have been in the car for several months, left there either intentionally or inadvertently. In this instance, however, that possibility was very remote because the car was a rental car, unlikely to contain an article of clothing not used for months. We are satisfied that the presence of a ski mask in a *rental* car in the hottest month of the year was sufficient to arouse the reasonable suspicion of Officer Callis, a police officer

for eighteen years, that the mask was likely to be destined for use (or to have recently been used) by a non-skiing robber, very possibly an armed robber. Accordingly, Officer Callis was justified in looking in the bag under the ski mask for weapons. *Terry v. Ohio, supra*, 392 U.S. at 27, 88 S.Ct. at 1883; *see Michigan v. Long, supra* note 8, 463 U.S. at 1046–1051, 103 S.Ct. at 3479–3482 (search for weapons in leather pouch under front seat armrest justified after officers saw a large knife on floor next to driver's seat); *Marbury v. United States, supra*, 540 A.2d at 116 (frisk of driver permissible because, *inter alia*, police noticed large bulge in his waistband); *United States v. Thomas, supra* note 8 (furtive movement by passenger upon approach of police officers justified protective search of area surrounding passenger's seat); *United States v. Green*, 151 U.S.App.D.C. 35, 465 F.2d 620 (1972) (furtive movement by driver upon approach of police officers justified protective search under driver's seat); *see also, e.g., State v. Thompson*, 348 So.2d 618 (Fla.App.1977) (probable cause for arrest established by, *inter alia*, two ski masks in plain view on front seat of car in Florida in the month of June); *City of St. Paul v. Johnson*, 288 Minn. 519, 179 N.W.2d 317 (1970) (two men entered store while wearing ski masks in relatively mild weather, left after a purchase, and were later found hiding in a car; arrest and search upheld as based on probable cause for officer, who followed them from the store, to believe that he had interrupted an attempted robbery).

The discovery of three guns in the bag with the ski mask gave Officer Callis and his colleagues probable cause to believe that the occupants of the car either were planning an armed robbery or had recently committed one. This justified not only the arrest of the three men but also the search

---

8. We note at the outset that, even though no one was in the car at that precise moment, Officer Callis was justified in examining the bag for weapons if he had a reasonable suspicion that weapons were there. *Michigan v. Long*, 463 U.S. 1032, 1051–1052, 103 S.Ct. 3469, 3481–3482, 77 L.Ed.2d 1201 (1983); *United States v. Thomas*, 314 A.2d 464, 467–469 (D.C.1974).

9. We note that several federal circuits are in agreement that suspicious behavior can support police intervention even if some innocent explanations for it cannot be ruled out. *See United States v. Rickus*, 737 F.2d 360, 365–366 (3d Cir. 1984) (citing cases).

of the trunk for robbery proceeds, more guns, or both.[10] *United States v. Ross, supra,* 456 U.S. at 823–824, 102 S.Ct. at 2172–2173; *Chambers v. Maroney,* 399 U.S. 42, 46–48, 90 S.Ct. 1975, 1978–1980, 26 L.Ed.2d 419 (1970) (probable cause to arrest occupants of car for armed robbery included probable cause to search entire car for guns and stolen money); *United States v. Burnett,* 791 F.2d 64 (6th Cir. 1986) (discovery of contraband in passenger compartment of car provided probable cause to search container in trunk); *United States v. Rickus, supra* note 9, 737 F.2d at 366–367 (discovery of apparent burglar tools in back seat, coupled with fact that both suspects wore bullet-proof vests, provided probable cause to search trunk).

Thus we hold that the protective frisk of the bag containing the ski mask was permissible under *Terry v. Ohio* and its progeny, and that the ensuing search of the trunk and seizure of the pistol were supported by probable cause. There being no other ground for reversal advanced by appellant, and none apparent on the record, the judgment of conviction is

AFFIRMED.

NEWMAN, Associate Judge, dissenting:

The issue raised by this case is whether the police had a reasonable suspicion based on specific and articulable facts to support a protective frisk of the automobile under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In my view, Officer Callis did not have a reasonable suspicion based on specific and articulable facts to justify reaching into the automobile and removing the ski mask from the bag, and thus there was no probable cause to search the trunk under *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Accordingly, I dissent.

The application of *Terry* to the facts of this case warrants a brief review of *Terry*

and its progeny to reestablish and to remind that the original justifications for seizure without probable cause were strictly circumscribed. In *Terry,* the Court addressed the situation where a veteran police officer stopped and frisked three suspicious-acting individuals on the street without probable cause. Specifically, Officer McFadden observed two men walk along an identical route and pause to stare in the same store window twenty-four times. After completing the route, the two men would congregate on a corner with one other man. Suspecting a possible "stick-up," McFadden followed the two men to where they joined the third, a few blocks from the store front. McFadden approached the three, identified himself as a police officer, and asked them their names. Terry "mumbled something," and at this point McFadden spun him around, patted down his outside clothing and removed a pistol. Terry was subsequently convicted of carrying a concealed weapon.

The Court held that a stop and frisk of individuals without probable cause is justifiable only when particular interests are at stake. The Court acknowledged that the governmental interest in crime prevention, detection and investigation may in "appropriate circumstances and in an appropriate manner" warrant a stop without probable cause. *Terry, supra,* 392 U.S. at 22, 88 S.Ct. at 1880. The Court characterized the "crux" of the case, however, as determining when, if ever, police could invade one's person by searching for weapons. *Id.* at 23, 88 S.Ct. at 1881. In dealing with this issue, the Court emphasized the "more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Id.* The Court concluded that when an officer justifiably believes that a suspicious-acting individual "is armed and pres-

---

**10.** Officer Callis testified that he and his fellow officers were looking for proceeds of a robbery, guns, or drugs. We need not consider whether the facts of this case would justify a search of the trunk for drugs, because there was clearly probable cause to search for guns or robbery proceeds, and because, in any event, we do not rely on police officers' subjective reasons for taking action but on the objective reasonableness of that action. *Marbury v. United States, supra,* 540 A.2d at 115–116.

ently dangerous" to himself or herself or to others, the officer can act to neutralize the threat of harm. *Id.* at 24, 88 S.Ct. at 1881. To justify the intrusion, however, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880.

Even while acknowledging the strong interest in preventing harm to police officers and others, the Court emphasized the competing privacy interest in being free from intrusive and warrantless searches lacking in probable cause. As the Court noted:

> We must still consider, however, the nature and quality of the intrusion on individual rights which must be accepted if police officers are to be conceded the right to search for weapons in situations where probable cause to arrest for crime is lacking. Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, ... A search for weapons in the absence of probable cause to arrest, ... must, like any other search, be strictly circumscribed by the exigencies which justify its initiation.

*Id.* at 24–26, 88 S.Ct. at 1881–1883 (citation omitted).

The Court extended *Terry* to areas in a car where weapons might be hidden or reached in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In *Long,* two police officers observed a speeding car in a rural area at night swerve into a ditch and decided to stop the car and investigate. *Id.* at 1034–37, 103 S.Ct. at 3473–74. Long, the driver, had gotten out of and walked away from his car, and "appeared to be under the influence of something." The officers asked Long for his registration and then followed him as he returned to his car to get it. When Long opened the door, one of the officers observed a hunting knife in plain view on the floorboard of the driver's side of the car. The officer then shone his flashlight into the car and noticed a protrusion under the armrest and, upon raising it, discovered an open pouch of marijuana.

Long was subsequently convicted for possession of marijuana.

Based upon the principles articulated in *Terry,* the Court in *Long* held that the *Terry* preventive search was not restricted "to the person of the detained suspect." *Long, supra,* 463 U.S. at 1047, 103 S.Ct. at 3480. The Court reasoned that the balancing mandated by *Terry* "clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as [police officers] possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.* at 1051, 103 S.Ct. at 3482. Thus, the Court found that, based on the facts available to the officers at the time, including the lateness of the hour, Long's erratic driving and apparent intoxication, the rural surroundings, the presence of the hunting knife in plain view, and the protrusion from under the armrest, the officers had a reasonable suspicion based on articulable facts that Long might pose a present threat to the officers if weapons within Long's grasp were concealed within the car. Without some basis in fact, however, the Court emphasized that a *Terry* search of the automobile would be impermissible, stating:

> We stress that our decision does not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop ... in the *Terry* context.... "The sole justification of the search ... is the protection of the police officer and others nearby." [*Terry, supra,*] 392 U.S. at 29 [88 S.Ct. at 1884].

*Long, supra,* 463 U.S. at 1049–50 n. 14, 103 S.Ct. at 3480–81 n. 14 (emphasis in original).

In my view, the majority's reliance on *Terry* and *Long* to support Officer Callis' actions is mistaken. *Supra* at 1207. Unlike the factual situations in those cases, the specific and articulable facts available to Officer Callis, both through information relayed to him by Sergeant Hinton before he stopped Thomas' car and observed by him after he stopped the car, simply did not support a *Terry* protective frisk for weap-

ons of the automobile. The only concern was that the car was stolen, not that it was involved in an armed robbery.

Sergeant Hinton testified that he observed three youths driving in a dirty rental car and that they committed two minor traffic violations. These factors aroused his suspicions because there had been a rise in the theft of Hertz rental cars that summer. In fact, Sergeant Hinton testified that other than ticketing Thomas for the traffic violations, his *sole* concern in stopping Thomas was to determine whether the car was stolen.[1] Hinton communicated his concerns to the other officers, including Callis, and radioed a search request to determine whether the car had been stolen, but Thomas' car was stopped[2] before the information from the search came back. Hinton admitted that normally, in situations where he suspected that a car was stolen, the purpose of the stop was to determine whether the driver of the automobile possessed a valid rental agreement. After the car was stopped, Thomas, in fact, presented Hinton with such a valid contract.

While Sergeant Hinton dealt with Thomas, Officer Callis, along with two other officers, approached the passenger side and ordered the other two occupants out of the car. After they stepped out, Officer Callis observed and removed a ski mask that was on top of a shoe bag which was sitting toward the center of the floorboard near the left side of the passenger seat. The shoe bag fell over, and Officer Callis heard the sound of metal clanking. He immedi-

ately looked into the bag and discovered three guns. This discovery created probable cause to search the trunk under *Ross, supra,* 456 U.S. at 823–24, 102 S.Ct. at 2172–73, because Callis testified that the guns and the ski mask aroused the officers' suspicions that the occupants of the car might have been involved in an armed robbery, and that other items related to the robbery, including guns or drugs, might be found in the trunk of the car. The pistol which the police found in the trunk was the basis for Thomas' conviction.

This chain of events should never have unfolded because there was no *Terry* justification for reaching into the car to remove the ski mask. At the expense of portraying a complete factual picture of this case, the majority unduly emphasizes the presence of a ski mask in a rental car in July. In hindsight, emphasis on only these factors is appealing. To test the reasonableness of an officer's suspicion, however, all of the facts available to the police officer at the time of the event must enter into the equation. This court has held consistently that in assessing the reasonableness of a seizure, "the police officer must be judged against an 'objective standard,' that is, whether the facts available to the police officer at the moment of seizure warrant a man of reasonable caution in the belief that the seizure was reasonable." *Offutt v. United States,* 534 A.2d 936, 938 (D.C. 1987); *Curtis v. United States,* 349 A.2d 469, 471 (D.C.1975); *Terry, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1879–1881. Further, to assess the reasonableness of the offi-

---

1. DEFENSE COUNSEL: And the purpose ... of having other fellow officers in a marked vehicle stop that car was because of your belief that the car might be stolen, correct?

   SERGEANT HINTON: That's correct.

   \* \* \* \* \* \*

   DEFENSE COUNSEL: So, is it accurate to state that the sole purpose of having the car stopped was your belief that the car might be stolen?

   SERGEANT HINTON: That's correct.

   DEFENSE COUNSEL: And you were not having the car stopped because you had any basis or belief that the car had itself been involved in any other crime of any sort, correct?

   SERGEANT HINTON: Again, I didn't have any independent knowledge of the car being

involved in any crimes or wanted for anything at the time.

   DEFENSE COUNSEL: So, is it accurate to state that the sole purpose of having the car stopped was your belief that the car might be stolen?

   SERGEANT HINTON: That's correct.
   Supplemental Record, at 30–31.

2. The use of the word "stopped" in this situation is perhaps an understatement, for in fact a plethora of police surrounded the car. Thomas and his two friends were greeted by two marked police cars carrying at least two uniformed police officers, two privately owned vehicles carrying at least three plain clothes officers, and one police scooter.

cer's action, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883.

The only facts available to Officer Callis were those communicated to him by Sergeant Hinton that three youths were driving a dirty rental car, and those he observed at the scene. At the most, these facts supported a concern that the car was stolen, but not that an armed robbery had occurred or was about to occur. Sergeant Hinton testified that Thomas' youthfulness aroused his suspicion since normally individuals under the age of twenty-five need a major credit card in order to rent automobiles. This fact is not particularly persuasive evidence that the car was stolen, much less that an armed robbery occurred, because credit cards for youths under the age of twenty-five are readily obtained. Hinton testified also that "there was some dirt on the car," and that usually cars are clean when they are rented; however, this fact does not impute that the car was stolen or that it was being used as a get-away car, given that the officers had no way of knowing where the car had been or for how long it had been rented. In addition, these events transpired at approximately 3:00 p.m. in the afternoon. Even the traffic violations for which Thomas was eventually stopped do not support a reasonable suspicion that an armed robbery had been or was about to be committed. Sergeant Hinton testified that during the ten minutes that he tailed the car, he briefly observed it accelerate to 40 mph in a 25 mph zone, but then slow down, and that it also went through a stop sign. Although these traffic violations warranted Sergeant Hinton in stopping Thomas, they certainly did not support any theory consistent with dashing to or away from a crime scene involving armed robbery. Finally, Officer Callis testified that Sergeant Hinton never radioed to him, or to any of the several police officers that converged on the scene,

that the car and its occupants might be involved in armed robbery or any crime involving weapons.

Similarly, the facts available to Officer Callis at the scene did not support the necessary inference that the suspects getting out of the car posed a present danger to the police officers. There was no testimony that the two resisted or were uncooperative in any way. Once they were out of the car, the threat to the officers was virtually extinct. Six police officers, including the two that had accompanied Officer Callis, surrounded the two suspects and could easily have subdued any attempt to arm themselves. Further, although the car door remained open, the bag was toward the center of the car and not easily within the reach of those standing outside. Thus, when Officer Callis saw the ski mask and removed it from atop the shoe bag, he acted not as a result of any particularized suspicion based on reasonable facts, but rather on an unparticularized hunch that the ski mask had been or was about to be used in an armed robbery. This he was not allowed to do. *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883.

I recognize that finding a ski mask in July in a rental car may be unusual. Unusualness, however, is not the standard which guides us. The two cases cited by the majority where ski masks were found by police officers are inapposite because those cases dealt with whether probable cause to arrest existed.[3] Indeed, in no case that I can find in this jurisdiction or anywhere else has a ski mask, without more evidence implicating armed robbery, provided the reasonable and articulable suspicion needed to support a protective frisk of an automobile.

I recognize also the caution with which police officers must approach these situations, especially today, in order to protect themselves and those around them. Accordingly, Officer Callis acted prudently when he ordered the occupants out of the car. This action was consistent with his

**3.** *See supra* at 1208 (citing *State v. Thompson,* 348 So.2d 618 (Fla.App.1977); *City of St. Paul v.*

*Johnson,* 288 Minn. 519, 179 N.W.2d 317 (1970)).

underlying concern that the youths had unlawfully acquired the car. By removing them from the car, he could more easily monitor them for any behavior that might cause him or others harm. But any further action was unjustified since no facts existed to support a reasonable and articulable suspicion that the officers were in danger. The two passengers did not resist or object. Indeed, no one testified to any commotion or trouble at all. The occupants stood away from the car and were separated from the bag that was towards the middle of the car. In addition, had either man lunged for the car, there certainly were enough officers present, at least six, including the two that accompanied Callis, to prevent harm. Finally, it is unlikely that, once the *Terry* stop was completed, the youths would get back into the car and shoot the police officers. *See* 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(e), at 533–34 (2d ed. 1987) (arguing that reentry into automobile after *Terry* stop may involve access to weapons inside car, but that danger is not likely since "it is most unlikely that a suspect would want to attack the officer who had just told him he was free to go").

The majority today engages in the increasing judicial tolerance to sanction seizures based on hyper-extended and misguided notions of the original justifications guiding seizures without probable cause. *See generally* Lippman, *Stop and Frisk: The Triumph of Law Enforcement Over Private Rights*, 24 Crim.Law Bull. 24 (Jan.–Feb. 1988); Acker, *Social Sciences and the Criminal Law—The Fourth Amendment, Probable Cause, and Reasonable Suspicion*, 23 Crim.Law Bull. 49 (Jan.–Feb. 1987). This tolerance, I cannot tolerate. I dissent.